**UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF OHIO
EASTERN DIVISION**

| | | |
|---|---|---|
| MARK C. FILING, | ) | CASE NO. 5:07CV1712 |
| | ) | |
| PLAINTIFF, | ) | JUDGE SARA LIOI |
| | ) | |
| vs. | ) | |
| | ) | |
| WILLIAM L. PHIPPS, et al., | ) | **MEMORANDUM OPINION** |
| | ) | **AND ORDER** |
| DEFENDANTS. | ) | |
| | ) | |

Before the Court is the motion of Defendants (Doc. No. 93) to strike section II(a) and III(c) of Plaintiff's motion for summary judgment.[1] Plaintiff filed a memorandum in opposition (Doc. No. 99) and Defendants filed a reply (Doc. No. 100). For the reasons discussed below, the motion is **GRANTED**.

## I. PROCEDURAL BACKGROUND

Plaintiff initiated this lawsuit on June 8, 2007, originally against only Defendant William L. Phipps ("Phipps") and ten John Does, asserting one federal securities law count and ten state law counts. On March 31, 2008, he filed an amended complaint (Doc. No. 28) against Phipps, Charles E. Zumkehr ("Zumkehr"), J. Martin Erbaugh ("Erbaugh"), James R. Blomberg ("Blomberg"), the law firm Roetzel & Andress, LPA ("Roetzel"), and Bruml Capital Corporation ("Bruml"), asserting a total of three counts of federal securities violations against the various defendants and 32 counts of state law violations.

---

[1] The motion for summary judgment is Doc. No. 85.

On October 17, 2008, the Court granted Roetzel's Rule 12(b)(1) motion to dismiss for lack of subject matter jurisdiction. The Court also determined *sua sponte* that all of the state law claims would be dismissed pursuant to 28 U.S.C. § 1367(c) because they substantially predominated over the federal claims and, additionally, raised several novel and complex issues of state law that would best be resolved in state court. (*See* Memorandum Opinion and Order, Doc. No. 61.) As a result of that ruling, the sole remaining counts of the amended complaint were Count 1 (a federal securities fraud claim against Phipps), Count 13 (a federal securities fraud claim against Zumkehr, Erbaugh, and Blomberg), and Count 23 (a federal securities fraud claim against Bruml). On October 28, 2009, Plaintiff voluntarily dismissed without prejudice all claims against Bruml. (*See* Stipulation and Order, Doc. No. 92.)

## II. FACTUAL BACKGROUND

A summary of the facts underlying Plaintiff's claims in this lawsuit was set forth by this Court as follows in the Memorandum Opinion and Order filed on October 17, 2008:

> [...] Plaintiff was a long-time employee of the White Rubber Company ("White Rubber"), a close corporation that manufactured and sold personal protective equipment and line tools for electrical workers; Plaintiff eventually came to hold 561 shares of White Rubber's 2,731 issued and outstanding shares. (Am. Compl. ¶ 2, 3.) Defendant William Phipps ("Phipps") was the President and CEO of White Rubber, sat on White Rubber's Board of Directors, and was White Rubber's controlling shareholder. (Am. Compl. ¶ 3.)
>
> Defendant Charles Zumkehr ("Zumkehr") was the Chairman of the Board of Directors and a White Rubber shareholder. (Am. Compl. ¶ 6.) He allegedly also acted as an attorney for White Rubber, though this is disputed by Roetzel. (*Id.*) Both parties concede that Zumkehr was associated with the law firm Roetzel during all the relevant events; however, the exact nature of Zumkehr's association is disputed. Plaintiff alleges in his Complaint and Memorandum opposing Roetzel's 12(b)(1) motion that Zumkehr was a partner at Roetzel. (See id.; Pl. Mem. Opp. Def. Mot. to Dismiss, at 3-5.) Roetzel, meanwhile, claims that Zumkehr had retired from the practice of law in 2001, and was only "of counsel" at Roetzel during all the relevant events.[3] (*See* Def. Mem. Supp. Mot. to Dismiss, at 3.)

2

[3] Roetzel also offered a sworn affidavit to that effect from Kevin J. Osterkamp, a partner at Roetzel who also serves as the firm's general counsel for risk management and ethics compliance. (*See* Doc. No. 43, Ex. A.)

Defendants J. Martin Erbaugh ("Erbaugh") and James R. Blomberg ("Blomberg") were directors of White Rubber. (Am. Compl. ¶¶ 7-8.)

Defendant Roetzel is a substantial, well-respected law firm headquartered in Akron, but having offices throughout Ohio and the rest of the country. (Am. Compl. ¶ 11.) Roetzel represented White Rubber and Phipps during all the events to be described below. (*Id*.) Also, in September 2000, Roetzel prepared 11 estate planning documents for Plaintiff and his wife Robyn.[4] (*See* Doc. No. 28, Ex. B (letter from Roetzel listing the 11 documents prepared at the request of Plaintiff and his wife).)

[4] As will be discussed below, there is a dispute as to whether preparation of these documents, along with a letter sent by Roetzel attorney Steven Cox to Plaintiff on December 31, 2001 (Doc. No. 28, Ex. D), made Plaintiff a current or a former client of Roetzel. Plaintiff alleges that he was a current client throughout the relevant time period; Roetzel maintains that he was a former client. Also as will be discussed below, this inquiry need not be decided by the Court at this time.

From the 1990s until 2003, White Rubber shares were valued by Schlabig & Associates, a regional accounting firm with offices in northern Ohio. (Am. Compl. ¶¶ 12, 16.) In early 2003, Schlabig valued White Rubber shares at $2,169.73 per share. (Am. Compl. ¶ 16.) Allegedly this valuation was unpalatable to Phipps, who wanted to solidify his control over White Rubber; accordingly, Phipps asked Chief Financial Officer Mark Royle ("Royle") to seek a new evaluator that would provide a lower valuation. (*Id*.) Royle eventually suggested Bruml Capital Corporation ("Bruml"). (*Id*.) In early 2003, Bruml initially valued the shares at $1,056.00 per share, but later increased the valuation to $1,702.58 per share, over $450 per share lower than Schlabig. (Am. Compl. ¶¶ 17, 19.) Contemporaneous to the time Bruml issued the lower evaluation, White Rubber had been experiencing an 8% compound annual growth rate (CAGR), with the Safety Line Division experiencing a 19% CAGR and certain elements in that Division experiencing a CAGR from 22% to 35%. (Am. Compl. ¶ 23.) Indeed, in making these valuations, Bruml conceded to the Board of Directors in a confidential report that "YTD June 2003 operating results compared with YTD June 2002 operating results have increased significantly in terms of net sales, gross margins, operating profit and operating cash flow." (*Id*.)

During the time Phipps allegedly encouraged Bruml to lower the valuation of the shares, a secret informal committee consisting of Erbaugh, Blomberg, Zumkehr, and Bruml was counseling Phipps in a secret negotiation of a merger with Norcross Safety Products, LLC ("Norcross"), White Rubber's chief competitor. (Am. Compl. ¶ 10.) Allegedly, negotiations with Norcross began as

early as September 2003, when Phipps, Erbaugh, Blomberg, Zumkehr, and William A. Young met with Robert Peterson ("Peterson"), the CEO of Norcross, at a trade show. (Am. Compl. ¶¶ 38-39.) There, the secret committee allegedly discussed a selling price of $25 million with Peterson. (Am. Compl. ¶ 40.)

Negotiations continued after the trade show. On December 1 or 2, 2003, Plaintiff alleges that the $25 million price was informally agreed upon. (Am. Compl. ¶ 43.) On December 8, 2003, White Rubber and Norcross signed a Confidentiality Agreement so that they could exchange highly confidential business material in order to facilitate negotiations. (Am. Compl. ¶¶ 44, 47.) In January 2004, Phipps and Zumkehr continued to discuss the transaction with Peterson until, on January 15, 2004, Norcross said it was ready, willing, and able to proceed with the transaction. (Am. Compl. ¶¶ 52-53.) Phipps and Zumkehr allegedly flew to Atlanta to meet with Peterson on February 10, 2004 to solidify discussions, and reported "favorable and continuing progress" to the Board of Directors. (Am. Compl. ¶¶ 57-58.)

In September 2003, the Board offered a solicitation bid to purchase shares from White Rubber shareholders. (Am. Compl. ¶ 25.) The motive of this solicitation bid was allegedly for Phipps to increase his voting power and lower the cost for the Company or him to acquire other shareholders' shares. (Am. Compl. ¶ 20.) The plan allegedly consisted of giving indications to the shareholders that the White Rubber stock values were declining due to challenging times, and then offering to purchase a shareholder's shares at Bruml's original valuation of $2,169.73 per share. (*Id.*) During this time, the Board knew of the alleged secret meetings with Norcross concerning a merger, as well as that Bruml was brought in to devalue the shares. (*Id.*)

Plaintiff, unaware of Bruml's devaluation and the secret discussions with Norcross concerning a merger, offered to sell all of his 561 shares at the $2,169.73 per share price. (Am. Compl. ¶ 28.) Phipps was apparently not expecting Plaintiff to offer all his shares for sale, but he reasoned that given Plaintiff's interest, he could convince Plaintiff to hold off selling shares at present and later acquire the shares for less. (Am. Compl. ¶ 29.) Phipps arranged a meeting between himself, Plaintiff, attorneys from Roetzel, and Plaintiff's special counsel. (*Id.*) At the meeting, Plaintiff alleges that Phipps portrayed the offer as having "erroneous aspects," and further stated that White Rubber would be unable to purchase all of Plaintiff's shares at the present time due to lack of capital. (*Id.*) As a result of this meeting, Plaintiff reconsidered his sale. (*Id.*)

On January 29, 2004, after a series of negotiations, Plaintiff sold 125 shares to each of Phipps and White Rubber. (Am. Compl. ¶ 32, 34.) During the negotiations, Royle reported to Plaintiff that because the sale was occurring later in time, the $2,169.73 per share price was "off the table," and that the Bruml valuation of $1,702.58 per share would be the purchase price. (Am. Compl. ¶ 32.)

4

> Plaintiff thus sold 250 shares—125 to each of Phipps and White Rubber—at $1,702.58 per share. (Am. Compl. ¶ 56.)
>
> On June 8 or 9, 2004, Norcross acquired all shares of White Rubber for $22 million. (Am. Compl. ¶ 72.) After deductions, this came to approximately $5,400.00 per share. (*Id*.)

(Doc. No. 61 at 1-5, footnotes in original.)

### III. DISCUSSION

Defendants' motion seeks an order striking Sections II(a) and III(c) from Plaintiff's motion for summary judgment.[2] In Sections II(a) of the motion, Plaintiff sets forth purportedly "undisputed facts" under the heading "Filing and Phipps Become Management Shareholders in White Rubber." (Doc. No. 85 at 9.) Plaintiff writes:

> In 1994 the shareholders of White Rubber entered into the ACCA. [Amended Close Corporation Agreement]. (Filing Dep., Defendant's Exhibit O, Feb. 3, 2009.) Per the ACCA, Filing, Phipps, Gregory Osborne and Robert McCarthy were named "Management Shareholders." *Id*. at Recital D. By 2003, Filing and Phipps were the only remaining Management Shareholders as Bob McCarthy had passed away and Gregory Osborne had retired from White Rubber. (Leffler Dep. 24:17-24:19, Mar. 16, 2009.) Pursuant to the ACCA at least eighty (80) percent of the shares of White Rubber needed to consent to any amendment of the ACCA. (Filing Dep. 87:17-87:20 & Defendant's Exhibit O, §11.02, Feb. 3, 2009.) As such, in 2003, the ACCA could not be amended without Filing's approval because Filing owned over twenty (20) percent of the outstanding shares of White Rubber. (Filing Dep. 207:13-207:15, Feb. 3, 2009.) This ownership interest gave Filing a veto power with regard to any amendment of the ACCA.
>
> The ACCA imposed certain restrictions on the transfer of shares by any shareholder, thereby enhancing the illiquid nature of White Rubber stock. No transfers were permitted except as provided by the ACCA. (Leffler Dep. 23:15-23:16, Mar. 16, 2009.) The ACCA mandated certain steps prior to a shareholder transferring his shares, whether or not for value. (Leffler Dep. 77:14-77:18., Mar. 16, 2009) To transfer shares under the agreement, a Management Shareholder would first have to offer his shares to the other Management Shareholders. (Leffler Dep. 24:22-24:25, Mar. 16, 2009; Filing Dep., Defendant's Exhibit O, §4.03.) The other Management Shareholder(s) would have the right to receive a notice of the transferring shareholders intent to transfer, and the notice must

---

[2] The Court notes that the parties' cross motions for summary judgment (Doc. Nos. 84 and 85) are filed under seal.

> specify the number of shares, the price, the terms of the proposed disposition, and the name and address of the proposed purchaser or transferee. (Leffler Dep. 24:22-25:6, Mar. 16, 2009.) Only after adhering to this process, and passing through other levels of first refusal rights by the Corporation and other shareholders, could a shareholder transfer stock to a pre-designated third party, such third party becoming subject to the ACCA. (Erbaugh Dep. 128:9-128:21. May 26, 2009.)
>
> Phipps did not adhere to the terms of the ACCA. As evidenced by the K-1s issued by the Corporation to Phipps in 1999, stock in White Rubber was transferred from Phipps personally to the ESBT [Electing Small Business Trust] Trust in 1999. (Waxman Dep. 157:24-158:8, April 27, 2009.) As evidenced by the K-1s issued by the Corporation in 2000, stock in White Rubber was transferred from the ESBT Trust to the QSST [Qualified Sub-Chapter-S Trust] Trust in 2000. (Waxman Dep. 159:19-159:22. April 27, 2009.) As evidenced by the K-1s issued by the Corporation in 2001 and 2002, the subject shares were wholly owned by the QSST. (Waxman Dep. 160:25-161:1, 161:14-161:15. April 27, 2009.) As evidenced by the K-1s issued by the Corporation in 2003, the subject shares were transferred from the QSST back to Phipps personally in 2003. (Waxman Dep. 162:8-163:13, April 27, 2009.)
>
> As of January 1, 2003 the Corporation caused to be circulated an Agreement and Action by Unanimous Written Consent of the Shareholders of White Rubber, ("Unanimous Action") which averred that ownership of the shares in White Rubber were accurately reflected in the attached exhibit, and that no shareholder had transferred shares of stock in the Corporation in any manner inconsistent with the shareholder record. (Erbaugh Dep., 113:16-25, May 26, 2009.) The exhibit attached to the Unanimous Action lists Phipps personally as the owner of White Rubber shares when in actuality said shares were wholly owned by the QSST Trust up to and including December 31, 2002. Contrary to this stated, and averred fact, Phipps caused shares held by the QSST Trust to be transferred back to his name personal at a time subsequent February 25, 2003 as reflected in Roetzel's billing records. (Leffler Dep., 155:2-22, Mar. 16, 2009.)

(Doc. No. 85 at 9-10.)

Based on these facts, in Section III(c) of his motion for summary judgment, Plaintiff argues that the failure to disclose the transfer of shares in contravention of the ACCA constituted material non-public information, the non-disclosure of which violates both Section 10(b) of the Securities Exchange Act of 1934 (15 U.S.C. § 78j(b)) and Rule 10b-5.

6

Plaintiff asserts that, under the ACCA, he enjoyed an option to purchase the shares of Phipps each and every time those shares were transferred (in 1999, from Phipps personally to the ESBT; in 2000, from the ESBT to the QSST; and in 2003, from the QSST back to Phipps personally). He argues that each of these transfers constituted independent violations of the applicable securities laws in that Phipps intended not to honor Plaintiff's option to purchase Phipps' shares. Plaintiff argues that Phipps never disclosed these transfers -- not at the time they were made nor in 2004 when Plaintiff sold a portion of his shares in White Rubber to Phipps and White Rubber.

Defendants argue in their motion that, after two and a half years of proceedings, including a complaint, an amended complaint, and oppositions to Rule 12(b) motions to dismiss, Plaintiff never once mentioned that his securities fraud claims against the Defendants were based on anything other than the 2004 sale of his shares. They assert that this is an entirely new theory of recovery and that, if it is not stricken from Plaintiff's motion for summary judgment, they should be entitled to some additional time to file their own cross-motion for summary judgment on this new theory.

The Court finds merit in Defendants' position. Clearly, Plaintiff is attempting to boot-strap unpled 1999 allegations to the claims in the Amended Complaint relating to the 2004 transfer of his shares. There is simply no hint in any of the pleadings to date that Plaintiff was making any securities fraud claim with respect to transactions as far back as 1999. Nor is there anything in Plaintiff's Rule 26 initial disclosures which would suggest that any such claim is

included among the allegations of the Complaint. (*See*, Doc. No. 93-1, Plaintiff's Initial Disclosures.)[3]

Defendants concede that Plaintiff's counsel orally raised the trust assignment issues during Plaintiff's deposition on February 3, 2009 and again during Phipps' deposition on February 5, 2009.[4] Thereafter, Plaintiff began requesting additional documents relating to these unpled trust issues.[5] Defendant's counsel invited Plaintiff's counsel to amend the complaint (*see*, Doc. No. 93-2, May 19, 2009 e-mail correspondence); however, no such request was made prior to the September 28, 2009 deadline for filing dispositive motions.[6]

As correctly argued by Defendants, Plaintiff's attempt to insert a new theory of recovery by way of a motion for summary judgment, as opposed to an amended complaint,[7]

---

[3] In particular, the Court notes Exhibit 1 to Plaintiff's initial disclosures where he expressly states that the total amount of compensatory damages claimed is $877,500.00, that is, "[t]he difference [he] would have earned had he not sold his 250 shares to White Rubber and William Phipps in January 2004[.]" (Doc. No. 93-1 at 9.)

[4] Defendants do not cite to any specific pages in either deposition. The Court found no reference in Plaintiff's deposition, but did find some discussion of the trust assignment in Phipps' deposition. (*See* Doc. No. 84-6, beginning at p. 5.)

[5] Defendant apparently supplied responses to these requests and did not seek a protective order. Defendants always objected to providing the discovery, but "permitted Plaintiff to complete the inquiry so as to avoid bothering this Court." (Doc. No. 100 at 2.) Plaintiff has argued that "Defendants have implicitly consented to the submission of these matters in summary judgment by acquiescing to Plaintiff's continued pursuit of facts related to the ESBT transfers during the discovery process." (Doc. No. 99 at 11.) Plaintiff's argument lacks merit. Parties often pursue irrelevant information during discovery, whether out of extreme caution or with a desire to harass the other side or to simply go on a "fishing expedition." The mere fact that the other party does not make an issue of it does not amount to consent and, even if it did, it would at most suggest "consent" to an amendment of the complaint or, to put it differently, an agreement not to oppose a motion for leave to further amend, an action which Plaintiff declined to pursue although encouraged to do so by the Defendants' counsel. (*See* Doc. No. 93-2.)

[6] Defendants also assert that there was discussion of further amendment of the complaint at the May 14, 2009 status conference, following the deposition of Stuart M. Horwitz on April 24, 2009 where Phipps' alleged transfers of stock to the ESBT and the QSST was discussed at some length. (*See*, Doc. No. 100-1.) Although neither the non-document minutes of those proceedings nor the Third Amended Case Management Conference Plan and Trial Order (Doc. No. 77) issued following the conference reflects that discussion, the Court does remember the issue arising and its concern that Plaintiff was somehow attempting to change course by belatedly inserting the trust assignment issues into the case.

[7] Plaintiff should not interpret this ruling as a suggestion from the Court that he should now seek leave to further amend his complaint. Any such request would clearly be untimely and would not be granted for any reason. In addition, as properly argued by the Defendants, any claim arising in 1999 would now be barred by the statute of

violates pleading requirements set forth in the Federal Rules of Civil Procedure. *See* Rule 8(a)(2) (a party must file a "short and plain statement of the claim showing that the pleader is entitled to relief"); Rule 9(b) (a party "must state with particularity the circumstances constituting fraud or mistake"); Rule 15(a) (providing for amendments of pleadings before trial).

## IV. CONCLUSION

For the reasons discussed herein, defendants' motion to strike (Doc. No. 93) is **GRANTED**. Sections II(a) and III(c) of plaintiff's motion for summary judgment (Doc. No. 85) are stricken from the record and will not be considered when the Court takes the motion under advisement.[8]

**IT IS SO ORDERED**.

Dated: August 6, 2010

                                          **HONORABLE SARA LIOI**
                                          **UNITED STATES DISTRICT JUDGE**

---

limitations. 28 U.S.C. § 1658(b) (action must be brought 2 years after discovery of facts constituting the violation or 5 years after the violation).

[8] The cross-motions for summary judgment are fully briefed and at issue. As the Court indicated during the telephone conference on July 27, 2010, under the reporting requirements of the Civil Justice Reform Act, these motions should be resolved during September. The Court is aware that the parties have been engaging in private mediation (and, in fact, deferred ruling on the dispositive motions pending that mediation). Following the telephone conference, the Court was advised that another mediation session is now scheduled for August 9, 2010. In the event such mediation is successful, counsel shall forthwith notify the Court.