UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF OHIO
EASTERN DIVISION

| | | |
|---|---|---|
| MARK C. FILING, | ) | CASE NO. 5:07CV1712 |
| | ) | |
| PLAINTIFF, | ) | JUDGE SARA LIOI |
| | ) | |
| vs. | ) | |
| | ) | |
| WILLIAM L. PHIPPS, et al., | ) | **MEMORANDUM OPINION** |
| | ) | |
| DEFENDANTS. | ) | |
| | ) | |

Before the Court are cross-motions for summary judgment. (Defendants' Motion, Doc. No. 84; Plaintiff's Motion, Doc. No. 85.)[1] Each side filed a memorandum in opposition to the other side's motion (Plaintiff's Opposition, Doc. No. 94; Defendants' Opposition, Doc. No. 95) and each also filed a reply (Defendants' Reply, Doc. No. 98; Plaintiff's Reply, Doc. No. 97). For the reasons discussed below, defendants' motion (Doc. No. 84) is **GRANTED** and plaintiff's motion (Doc. No. 85) is **DENIED**.

## I. FACTUAL AND PROCEDURAL BACKGROUND

Plaintiff was a long-time employee of the White Rubber Company ("White Rubber"), a close corporation that manufactured and sold personal protective equipment and line tools for electrical workers. He owned 561 shares of White Rubber's 2,731 issued and outstanding shares. (Am. Compl. ¶¶ 2, 3.) Defendant William Phipps ("Phipps") was the

---

[1] By previous order (Doc. No. 119), the Court struck sections II(a) and III(c) of plaintiff's motion for summary judgment.

President and CEO of White Rubber, sat on White Rubber's Board of Directors, and was White Rubber's controlling shareholder. (*Id.* at ¶ 3.) Defendant Charles Zumkehr ("Zumkehr") was the Chairman of the Board of Directors and a White Rubber shareholder. (*Id*. at ¶ 6.) Defendants J. Martin Erbaugh ("Erbaugh") and James R. Blomberg ("Blomberg") were directors and shareholders of White Rubber. (*Id*. at ¶¶ 7-8.)

White Rubber shareholders were parties to an Amended Close Corporation Agreement ("ACCA") which provided, among other things, that in the event of the death of a shareholder, the shareholder's stock would be bought by White Rubber or another shareholder at a set price. For purposes of setting that price, from the 1990s until 2003, White Rubber shares were valued by Schlabig & Associates, White Rubber's accounting firm. As of December 31, 2002, Schlabig valued White Rubber shares at $2,169.73 per share. (*Id.* at ¶ 16.)

Phipps testified that, beginning as early as February 2000, certain directors began to question Schlabig's valuation methodology. (Phipps Dep., Doc. No. 86-2, at 71-72.).[2] The Board decided to seek another valuation and, at the suggestion of Chief Financial Officer Mark Royle, the Board engaged Bruml Capital Corporation ("Bruml"). In early 2003, Bruml initially valued the shares at $1,056.00 per share, but later increased the valuation to $1,702.58 per share, about $467 per share lower than Schlabig. (Am. Compl. ¶¶ 18-19.)

By letter dated September 5, 2003, shareholders were informed about this change in valuation. White Rubber indicated its willingness to entertain an offer to purchase shares at

---

[2] Defendant Erbaugh testified that he felt strongly that the company needed a completely independent valuation of the shares for purposes of the ACCA. (Erbaugh Dep., Doc. No. 87-3, at 126, 133.)

$2,169.73 per share, provided any such offer was made by September 30, 2003.[3] The letter urged shareholders to seek counsel before making any offer and also warned:

> Obviously, in considering making the tender offer, you must consider the value the Corporation is currently willing to pay for your shares as compared to what value they may have in the future. Additionally, you should consider what value liquidating your interest in the Corporation at this time would provide you. The Corporation is not making any representation that at some point in the future the value of the Corporation will be any amount.

(Defs.' Mot., Ex. D.) Filing admitted at his deposition that both he and his attorney, Bernard Schneier, had read and understood these warnings. (Filing Dep., Doc. No. 86-1, at 130.) He timely offered to sell all 561 of his shares. (*Id.* at 127.) Phipps, however, promptly informed Filing that White Rubber could not afford to buy them all. Filing had only one conversation with Phipps about this matter and he had no conversations whatsoever with Zumkehr, Blomberg and/or Erbaugh. (*Id.* at 160-61.)

Filing decided to pursue the sale, offering to sell 250 shares -- 125 to White Rubber and 125 to Phipps. (Filing Dep. at 164, 168.) Filing's attorney, Schneier, handled the negotiations with Phipps's attorney, Fred Leffler. (*Id.* at 176; Phipps Dep. at 86.) During the negotiations, Schneier requested a Purchase Price Adjustment ("PPA") clause that would entitle Filing to the difference between the price he sold his stock for and any higher value in the event White Rubber was sold within a five-year period following Filing's sale of stock. (Schneier Dep., Doc. No. 86-3, at 87-88.) That proposal was rejected, but Filing did not withdraw his offer to sell his shares. (*Id.* at 123.)

---

[3] Neil Waxman, a White Rubber shareholder and financial planner who worked with Phipps, testified that "the purpose of the tender offer was to give the shareholders the benefit of the higher valuation since we were going to go forward and use a more realistic valuation." (Waxman Dep., Doc. No. 88-1, at 76.)

In November 2003, White Rubber's Board approved the deal to buy Filing's shares and the agreement was memorialized in a Redemption Agreement with White Rubber and a Stock Purchase Agreement with Phipps. (Schneier Dep. at 109; Phipps Dep. at 197-98.) Both documents contained integration clauses.[4] The Redemption Agreement also contained an accelerated payment clause that would trigger if White Rubber were sold before all payments to Filing were made. (Defs.' Mot., Ex. G, ¶ 2(b).) Filing testified that he and his attorney read and understood these agreements before they were executed. (Filing Dep. at 177-78.)

Filing now alleges that the September 5, 2003 letter failed to disclose a material piece of information that would have mattered to him, namely that, by the time the letter was sent, discussions had already begun about a possible merger between White Rubber and Norcross Safety Products, LLC ("Norcross"), White Rubber's chief competitor. The parties differ as to when the negotiations began and how serious they were. The complaint alleges that they began as early as September 2003, when Phipps, Erbaugh, Blomberg, Zumkehr, and William A. Young met with Robert Peterson ("Peterson"), the CEO of Norcross, at a trade show.[5] In their motion for summary judgment, defendants assert that Peterson first contacted Phipps by phone shortly before October 23, 2003 (after Filing's offer to sell his shares to White Rubber and Phipps) to express interest in purchasing White Rubber.

It seems undisputed that Phipps, Blomberg and Erbaugh met with Peterson and Norcross's CFO, David Myers, on December 2, 2003. (Phipps Dep. at 190-91, 193-94, 199;

---

[4] The clause stated:

> This Agreement embodies all representations, obligations, agreements and conditions in relation to the subject matter hereof, and no representations, obligations, understandings, or agreements, oral or otherwise, in relation thereto exist between the parties except as expressly set forth herein. [. . .]

(Defs.' Mot., Ex. G., ¶ 7; Ex. H, ¶ 7.)

[5] Filing testified at his deposition that the trade show occurred at the end of September 2003. (Filing Dep. at 34.)

Blomberg Dep., Doc. No. 87-1, at 7, 9, 12; Peterson Dep., Doc. No. 86-4, at 81.) After this meeting, Peterson suggested that they sign a confidentiality agreement to keep the door open for future communications. (Phipps Dep. at 194.) Myers testified at his deposition that Norcross approached "dozens and dozens and dozens and dozens" of companies about potential acquisitions during that same time period and exchanged confidentiality agreements with hundreds of potential acquisition targets. (Myers Dep., Doc. No. 84-11, at 39-41.)

On January 5, 2004, Norcross sent Phipps a due diligence requests asking for a large number of documents from White Rubber. White Rubber perceived this as "a bit of a fishing expedition." (Waxman Dep. at 117.) No meaningful financial information was shared, partly because White Rubber knew Norcross was also for sale. (*Id*. at 102.)

Thereafter, there was no contact until May 7, 2004, when Norcross made a non-binding offer to purchase the assets of White Rubber for $25 million. (Defs.' Mot., Ex. L.) Later, after receiving financial information from White Rubber, Norcross reduced its offer to $18 million. (*Id.*, Ex. M.) Following that reduced offer, all talks stopped. (Myers Dep. at 42; Peterson Dep. at 42, 166.)

In May 2005, Norcross itself was acquired by Odyssey Investments. (Myers Dep. at 48; Peterson Dep. at 43.) This provided additional capital for Norcross to pursue acquisition opportunities. (Myers Dep. at 48; Peterson Dep. at 113.) Norcross and its new owner met with Phipps and Zumkehr in September 2005. (Zumkehr Dep., Doc. No. 88-2, at 84.) On June 8 or 9, 2006, Norcross acquired all shares of White Rubber for $22 million. (Phipps Dep. at 69, 156.) After deductions, this came to approximately $5,400.00 per share. (Peterson Dep. at 99.)

Plaintiff initiated this lawsuit on June 8, 2007. The only two counts now remaining for resolution are Count 1 (a federal securities fraud claim against Phipps) and Count

13 (a federal securities fraud claim against Zumkehr, Erbaugh, and Blomberg), all other counts having been dismissed. (*See* Memorandum Opinion and Order, Doc. No. 61; Stipulation and Order, Doc. No. 92.)

## II. DISCUSSION

### A.     Summary Judgment Standard

When a party files a motion for summary judgment, it must be granted "if the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c)(2). "When a motion for summary judgment is properly made and supported, an opposing party may not rely merely on allegations or denials in its own pleading; rather, its response must--by affidavits or as otherwise provided in this rule--set out specific facts showing a genuine issue for trial." Rule 56(e)(2). Affidavits filed in support of or in opposition to a motion for summary judgment "must be made on personal knowledge, set out facts that would be admissible in evidence, and show that the affiant is competent to testify on the matters stated." Rule 56(e)(1).

### B.     Analysis

Section 10(b) of the Securities Exchange Act of 1934 ("the Act") makes it unlawful "to use or employ, in connection with the purchase or sale of any security [. . .], any manipulative or deceptive device or contrivance in contravention of such rules and regulations as the [Securities and Exchange] Commission ["SEC"] may prescribe as necessary or appropriate in the public interest or for the protection of investors." 15 U.S.C. § 78j(b). The SEC has promulgated Rule 10b-5, which makes it unlawful: "(a) [t]o employ any device, scheme, or artifice to defraud, (b) [t]o make any untrue statement of a material fact or to omit to state a

6

material fact necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading, or (c) [t]o engage in any act, practice, or course of business which operates or would operate as a fraud or deceit upon any person, in connection with the purchase or sale of any security." 17 C.F.R. § 240.10b-5. "The courts have implied from these statutes and Rule a private damages action, which resembles, but is not identical to, common-law tort actions for deceit and misrepresentation." *Dura Pharmaceuticals, Inc. v. Broudo*, 544 U.S. 336, 341 (2005) (citing cases).

In order to establish a violation of § 10(b) and Rule 10b-5, the plaintiff must prove: "(1) a material misrepresentation (or omission); (2) scienter, *i.e.*, a wrongful state of mind; (3) a connection with the purchase or sale of a security; (4) reliance [. . .]; (5) economic loss; and (6) 'loss causation,' *i.e.*, a causal connection between the material misrepresentation and the loss." *Id*. at 341-42 (internal citations omitted).

### 1.     Claim 1 (Against Defendant Phipps)

Defendant argues that the only statement Filing alleges was made by Phipps is not actionable. He references the following exchange during Filing's deposition:

Q.     My first question then is, did Mr. Phipps give you any false information at any point in time?

* * *

A.     Mr. Phipps did present me with information and [. . .] an opportunity to sell shares, and I was told that the shares were being revaluated, *and they were possibly at the highest price that they would be.* Never was I told that at that time they were in negotiations with Norcross Safety, our largest competitor, a cash rich competitor.

Q.     Were there any other statements that Mr. Phipps made to you that you believe were false that form the basis of your claim today?

* * *

7

A.      I don't want to define false. Maybe misleading, but not false.

(Filing Dep., at 21-22, emphasis added.)

Defendant argues that the italicized phrase in the testimony above relates to a statement of future valuation and, as such, is not actionable. *See Glassman v. Computervision Corp.*, 90 F.3d 617, 626 (1st Cir. 1996) ("Since price is only a forecast of the firm's future performance, it is not actionable merely because the forecast, in hindsight, does not turn out to be correct."); *see also* 15 U.S.C. §§ 78u-5(c)(1), (i)(1) (creating a safe harbor for "forward-looking statements"). In the alternative, defendant asserts that the integration clause in the Redemption Agreement and the Stock Purchase Agreement bars any misrepresentation claim.

These arguments, however, ignore plaintiff's assertion that what was misleading was defendant's *omission* of relevant information from the September 5, 2003 letter, namely, that White Rubber was already engaged in discussions with Norcross about a possible purchase of White Rubber by Norcross, a major cash rich competitor.

A plaintiff's "lack of knowledge states a claim for violation of section 10(b) of [the Act] only if defendant possessed knowledge unavailable to plaintiff which he had a duty to disclose." *Aschinger v. Columbus Showcase Co.*, 934 F.2d 1402, 1406 (6th Cir. 1991). "Under Rule 10b-5, the relationship between corporate insiders and the stockholders of a corporation gives rise to an obligation to 'disclose material facts which are known to them by virtue of their position but which are not known to persons with whom they deal and which, if known, would affect their investment judgment.'" *Id.* at 1407 (quoting *Chiarella v. United States*, 445 U.S. 222, 227 (1980)).

Filing was one of the few White Rubber shareholders who was not on the Board of Directors. Therefore, absent being told of any negotiations (so that he could factor that in

8

when deciding whether to offer his shares for sale), he would have had no way of knowing or discovering the fact that negotiations were ongoing, if they were.

There is no dispute that Filing was not told about any negotiations with Norcross, not at the time of the September 5, 2003 letter, nor when the buy-back of his shares was approved by the Board in November 2003, nor when he executed the documents to complete the sale in February 2004 (with an effective date of January 1, 2004). What is in dispute is whether (and when) discussions occurred between White Rubber and Norcross *and* whether the fact of such discussions could properly have been considered "material."

"Information is material if it would 'be considered significant to the trading decision of a reasonable investor.'" *Aschinger*, 934 F.2d at 1410 (quoting *Basic, Inc. v. Levinson*, 485 U.S. 224, 236 (1988)). "The materiality of the information misstated or withheld is determined in light of what the defendants knew at the time the plaintiff committed himself to sell the stock [. . .]." *Michaels v. Michaels*, 767 F.2d 1185, 1195 (7th Cir. 1985) (citing *Radiation Dynamics, Inc. v. Goldmuntz*, 464 F.2d 876, 891 (2d Cir. 1972) (commitment to sell occurs when "the parties obligated themselves to perform what they agreed to perform even if the formal performance of their agreement is to be after a lapse of time")). "The law mandates only the disclosure of existing facts, not that an insider volunteer an economic forecast or disclose his educated guesses or predictions based upon superior financial or other expert analysis." *Greening v. Litton Indus. Automation Sys., Inc.*, 53 F.3d 331 (6th Cir. 1995) (Table) (citing *Arber v. Essex Wire Corp.*, 490 F.2d 414, 421 (6th Cir. 1974)).

Defendant argues that what Filing refers to as "negotiations" amounted to no more than "preliminary discussions," which, as a matter of law, were not material because the sale of White Rubber to Norcross did not occur until two and a half years after Filing sold his

9

stock to White Rubber and Phipps. Defendant asserts that, on January 1, 2004, when Filing's sale of shares was effective, "the probability of a merger between White Rubber and Norcross was extremely low[ ]" because any discussions at that time were "'preliminary at best.'" (Defs.' Mot., at 17, quoting Peterson Dep. at 149.)

Most of the major players in this lawsuit cannot remember having discussions much less exactly when any such discussions might have occurred. Peterson referred to any discussions in the latter part of 2003 as "preliminary at best." (*Id*.). Phipps testified that there were no negotiations or discussions with Norcross in 2003 (Phipps Dep., at 61), that the earliest the entire board of White Rubber would have been aware of any overtures by Norcross was February 2004 (*id*. at 64), and that, at the time Filing sold his shares, there was nothing of substance to discuss or disclose (*id*. at 69-70). Zumkehr did not consider any discussions serious until after September 2005 at a time when Norcross had been acquired by Odyssey Partners. (Zumkehr Dep., at 84.) Blomberg testified that he, Erbaugh and Phipps met with Peterson and his CFO, David Myers, on December 2, 2003 at Norcross offices in Illinois; this was a "get-acquainted meeting" initiated by Peterson, described by Blomberg as "a very obtuse meeting with zero actionable activity afterwards." (Blomberg Dep., at 7, 12.) Although there was a confidentiality agreement signed between Norcross and White Rubber in the early part of 2004 (Phipps Dep. at 153), this was perceived as simply a precaution (*id*. at 195) in the event they were to exchange any financial documents that might be able to give them a preliminary indication as to valuation of the two companies (Peterson Dep. at 12).[6]

---

[6] Filing makes much of the fact that Phipps had his personal attorney, not White Rubber's attorney, review the proposed confidentiality agreement and billed the legal work to his own expense account rather than going through the usual billing channels. (Pl.'s Mot., at 13.) However, this merely suggests the sensitivity of the discussions; it does not reveal anything about the nature or seriousness of the discussions.

In light of the entire record, including transcripts of the depositions of the parties, the Court concludes that no reasonable jury could find that discussion between Norcross and White Rubber around the time of plaintiff's offer to sell his stock to White Rubber and Phipps had risen to any level of seriousness such that a reasonable investor (i.e., Filing) would have considered such information material to his decision to sell his shares.

Assuming that Phipps had a duty to disclose material information to Filing, there was nothing material relating to discussions with Norcross that should have been shared by Phipps in September 2003 when Filing agreed to sell his shares, nor in November 2003 when White Rubber's Board agreed to buy some of his shares, nor in January 2004 when the shares were actually sold to White Rubber and Phipps. At all of those dates, any possible acquisition of White Rubber by Norcross would have been highly speculative, at best.

Accordingly, to the extent Doc. No. 84 seeks summary judgment in favor of Phipps on Claim 1, the motion is **GRANTED**. To the extent Doc. No. 85 seeks summary judgment on this claim in favor of Filing, it is **DENIED**.

### 2.    Claim 13 (Against Defendants Zumkehr, Erbaugh, and Blomberg)

Defendants argue that Filing cannot establish a securities fraud claim based on any misrepresentation by Zumkehr, Erbaugh or Blomberg because he never alleged any misrepresentation by any of them and because, by his own admission, he never had any communications with any of them regarding the sale of his shares. (Defs.' Mot. at 12, citing Filing Dep.) Defendants also argue that, in any event, none of them had a duty to disclose anything to Filing because they were not engaged in insider trading, i.e., they were not buying or selling securities. Finally, these defendants argue that Filing cannot prove the necessary element of scienter.

11

The arguments of the parties with respect to this claim, as with the claim against Phipps, rest on the question of the materiality of the discussions with Norcross and whether they should have been disclosed. If these discussions had indeed been serious as early as September 2003 when the Board of Directors, including Zumkehr, Erbaugh and Blomberg, issued the letter indicating the company's willingness to entertain tender offers from shareholders to sell back their shares to White Rubber, or in November 2003 when the Board agreed to buy Filing's shares, or in January/February 2004 when the sale finally occurred, then failure to disclose such information *might* have been a violation of their fiduciary duty under federal securities laws. Although they were not themselves trading any shares, if it could be shown that Zumkehr, Erbaugh, and/or Blomberg, as shareholders, enjoyed a *personal benefit* as a result of the insider trading of others (e.g., Phipps) on the basis of undisclosed material information, then they would be liable for a securities violation. *See e.g., U.S. Securities & Exchange Comm'n v. Blackwell*, 291 F.Supp.2d 673, 687 (S.D. Ohio 2003) (discussing the possibility that a corporate insider's breach of fiduciary duty by giving a tip to a shareholder might result in personal benefit which rises to the level of a securities violation).

That having been said, as already discussed above, there was nothing material relating to discussions with Norcross that should have been shared at any of the relevant times because, at all of those times, any possible acquisition of White Rubber by Norcross would have been highly speculative, at best. The Court need not determine whether Zumkehr, Erbaugh, and/or Blomberg had a duty to disclose for the simple reason that there was nothing to disclose.

Accordingly, to the extent Doc. No. 84 seeks summary judgment in favor of Zumkehr, Erbaugh, and Blomberg on Claim 13, the motion is **GRANTED**. To the extent Doc. No. 85 seeks summary judgment on this claim in favor of Filing, it is **DENIED**.

### III. CONCLUSION

For the reasons set forth above, Doc. No. 84 is **GRANTED** and Doc. No. 85 is

**DENIED**. Summary judgment will be entered in favor of the defendants and this case will be

dismissed.

**IT IS SO ORDERED**.

Dated: September 24, 2010

_____
**HONORABLE SARA LIOI**
**UNITED STATES DISTRICT JUDGE**

13